IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRAIG SCOTT,

                Plaintiff,

v.

UNITED STATES OF AMERICA,
on behalf of the U.S. Air Force and
U.S. Department of Health and
Human Services,

                Defendant.

Case No. 3:18-CV-00629-NJR

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court are several motions between the two remaining parties in this action, Plaintiff Craig Scott and Defendant United States of America ("United States"). The United States represents both the United States Air Force ("Air Force") and the United States Department of Health and Human Services ("HHS") in this action. Currently pending are three motions for summary judgment—one filed by the United States for the Air Force, one by the United States for the Air Force and HHS, and one by Scott. (Docs. 185; 186; 188). Moreover, there are three pending motions attacking expert opinions and testimony—two by the United States, and one by Scott. (Docs. 166; 187; 190).

## FACTUAL BACKGROUND

In April 2006, Scott underwent surgery on his lower left leg which addressed occlusion (blockage) in several arteries. (Doc. 188-1). Shortly thereafter in a follow-up appointment, a non-party physician prescribed Coumadin (the brand name for an

anticoagulant called Warfarin) to treat Scott's newly diagnosed peripheral vascular disease. (Doc. 188-4). This appointment occurred at a Federally Qualified Health Center operated by Southern Illinois Health Care Foundation, Inc., referred to as the Belleville Family Health Center, in Belleville, Illinois (a civilian clinic operated by HHS, next to a military clinic operated by the Air Force). (*Id.*). Scott also received primary care at the civilian clinic from 2011 to 2015, and in 2013, he was assigned to a resident, Dr. Erynn Elleby. (Doc. 188-5). In November 2014, Elleby discontinued his Coumadin prescription pending Scott's presentation for lab work. (Doc. 188-7). Then, Scott sought to switch primary care services to the VA. (Doc. 188-9).

In February 2015, Scott developed issues with his lower right leg and foot. (*Id.*). After seeking care at the VA earlier in the month, Scott presented to the Protestant Memorial Medical Center ("Memorial Hospital" or "Memorial") Emergency Room on March 31, 2015, with complaints regarding his afflicted lower right leg and foot. (*Id.*; Doc. 188-11). Days later, Scott returned to Memorial Hospital for vascular testing. (Doc. 188-12). Using its automated fax system ("Forward Advantage"), Memorial intended to send copies of the medical notes from Scott's visits to Dr. Elleby, including the vascular study and abnormal arterial study. (Docs. 188-11; 188-12; 188-20, p. 2). In May 2015, Scott returned to the VA and visited another hospital, Christian Hospital, multiple times for heart palpitations and lower extremity pain. (Docs. 188-13; 188-14; 188-15). From there, Scott was referred to an orthopedic specialist and was eventually transferred to Barnes-Jewish Hospital where he underwent a below-knee amputation of his right leg in July 2015. (Docs. 188-18; 188-19).

To maintain the Forward Advantage automated fax system, analysts at Memorial would add and update a provider dictionary. (Doc. 188-20, pp. 5-7). In attempting to send

Scott's medical records to Dr. Elleby, the Forward Advantage system utilized a fax number associated with the adjacent military clinic operated by the Air Force instead. (Doc. 183, ¶ 16). The military and civilian clinics participated in a residency program and operated on the same floor but in separate spaces. (Doc. 188-23). According to Scott, Memorial and the military and civilian clinics were all aware of ongoing fax delivery issues. (Docs. 188-24; 188-25). As common practice, the two clinics would set aside misdirected faxes for the other clinic to retrieve. (Docs. 188-22; 188-24; 188-26). The United States disputes that the military clinic ever received the faxes from Memorial pertaining to Scott.

In his Second Amended Complaint, Scott claimed that Memorial failed to properly handle his medical records or communicate with his medical providers. (Doc. 179, pp. 9-11). But Scott's claims against Memorial Hospital have since been settled. (Docs. 216; 218). As to the United States, Scott contends that the military and civilian clinics[1] negligently handled the faxed medical records and failed to properly communicate with his medical providers which prolonged and exacerbated his condition leading to his ultimate amputation.  (Doc. 179, pp. 6-9; *See* member case, *Scott v. USA*, No. 19-cv-1029-NJR, at Doc. 37). Both Scott and the United States move for summary judgment on various issues and attack proposed expert testimony before trial.

MOTIONS FOR SUMMARY JUDGMENT

## I.      Legal Standard

A court should grant summary judgment "if the movant shows that there is no

---

[1] Scott initially filed this action only against the civilian clinic operated by HHS, and through discovery, found potential liability on behalf of the Air Force at the military clinic. This prompted Scott to file a separate action in 2019. The cases were consolidated for discovery purposes. (Doc. 68). The member case, against the Air Force, associated with this action is *Scott v. USA*, No. 19-cv-1029-NJR.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II.     United States' Motion on behalf of the Air Force (Doc. 185)

The United States argues that Scott's claim against the Air Force accrued shortly after July 2015 when his medical records were sent to his prior counsel, and therefore he submitted an administrative claim to the Air Force over a year late under the Federal Tort Claims Act ("FTCA"). Scott received records from Memorial on August 27, 2015, which according to the United States, contained the necessary information for Scott to pursue and discover any potential Air Force involvement in this case. As such, the United States contends that Scott's claim involving the Air Force accrued on that date rendering his administrative tort claim due to the Air Force by August 27, 2017. Because Scott submitted his administrative claim in March 2019, the United States urges that Scott submitted his administrative tort claim in an untimely fashion entitling the United States to summary judgment. Moreover, the United States claims that the untimeliness resulted in prejudice as the relevant fax equipment was

likely moved from Scott Air Force base in October 2017, and its whereabouts are unknown. The United States avers that if Scott's claim was filed in the appropriate timeframe, such equipment may have been readily available for examination and use in defending this case.

On the other hand, Scott contends that he did not know or have reason to know of potential negligence by the Air Force until September 2018 when, through discovery related to the claims against the civilian clinic, he realized that Memorial possibly faxed his medical records to a number associated with the military clinic. This realization came about following the deposition of Cindy Jorns, an employee at Memorial, who alerted Scott that the fax number used to transmit his medical records to the civilian clinic was actually a number listed for a military nurse station. About six months later, in March 2019, Scott submitted an administrative tort claim for personal injury to the Air Force. Then, in September 2019, Scott filed a complaint against the United States regarding the military clinic in this case's member case. As such, Scott argues his administrative claim and subsequent complaint were timely.

The FTCA provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). The Seventh Circuit instructs that an FTCA claim accrues in two ways: when (1) an individual actually knows enough to tip him off that a government act (or omission) may have caused his injury; or (2) a reasonable person in the individual's position would have known enough to prompt a deeper inquiry. *Blanche v. United States,* 811 F.3d 953, 958 (7th Cir. 2016). The former presents a subjective analysis; the latter presents an objective analysis. *Id.*

Under the subjective analysis, the parties do not dispute the timeliness of Scott's FTCA claim against the Air Force. Clearly, Scott actually knew enough to tip him off that the Air

Force may have negligently caused his injury in September 2018 when he realized for the first time that Memorial possibly faxed his medical records to a number associated with the military clinic following the deposition of Cindy Jorns.

Instead, the parties disagree over the result of the objective analysis. The United States argues that a reasonable person in Scott's position would have known enough to prompt a deeper inquiry into potential involvement of the military clinic when his original attorney received his medical records from Memorial and the civilian clinic in August 2015. At that point, the United States contends that Scott's attorney should have inquired further into how and when Memorial attempted to send the information to Dr. Elleby at the civilian clinic. Given the abnormal finding in his arterial doppler test result, Scott suspected someone should have done more and acted earlier to prevent his amputation. The United States asserts that a reasonable person should have realized that the civilian clinic records omitted records from Memorial for Scott's March 31, 2015, and April 4, 2015, visits, which should have prompted further inquiry as something was clearly amiss. As such, according to the United States, the delivery of these records triggered the accrual clock for Scott's claims against the Air Force.

Obviously, Scott disagrees. He contends that the Memorial production informed Scott that his emergency room visit records were "copied to" his listed primary care provider, Dr. Elleby, and that these records were absent from the civilian clinic production. Scott urges that this potential discrepancy between the Memorial records and the civilian clinic records would not lead a reasonable person to jump to the conclusion that the records fell into the hands of a separate party. Rather, a reasonable person may suspect that either Memorial did not actually send the records, or the civilian clinic lost or mishandled the records—both

theories he pursued in this action. Additionally, Scott points to the testimony of Sheena Grover, the civilian clinic medical records clerk, that by clinic policy outside emergency department records cannot be produced by the civilian clinic pursuant to a records request. (Doc. 201-2). Grover stated that only records generated at the clinic or outside records ordered by the clinic physicians could be produced in a records request, not third-party records or secondary records of visits to other hospitals sent to the civilian clinic. (*Id.*). Thus, an omission of these records in the civilian clinic production may have been insignificant in context, not alerting Scott to any potentially lost or mishandled records.

The crux of the United States' argument is that the absence of the Memorial records in the civilian clinic production should have provided further reason to think something may have been amiss, which should have prompted Scott to investigate how and when Memorial sent the records to Dr. Elleby. But an omission of this type of secondary records, according to the civilian clinic's medical records clerk, was common practice and might indicate that nothing was amiss. The Court is not convinced that the absence of the Memorial emergency room visit records in the civilian clinic production provided to Scott's original attorney were enough to prompt Scott to further investigate, let alone direct his investigation towards outside clinics or agencies.

The United States cites to *E.Y. ex rel. Wallace v. United States*, 758 F.3d 861 (7th Cir. 2014), to support its position. In *Wallace*, a mother received prenatal care at a federally qualified health clinic and subsequently delivered her baby at a private hospital. *Id.* at 863-64. A year later, the child was diagnosed with cerebral palsy. *Id.* Once the mother retained counsel several months after receiving the diagnosis, her attorneys requested records from the hospital and her prenatal care facility, the federally qualified clinic. *Id.* The clinic provided

a partial set of records. *Id.* The Seventh Circuit determined that the receipt of these partial records triggered the accrual clock, because the records solidly indicated that something might have been amiss with her prenatal care, and, as such, a reasonable person would have inquired further. *Id.* at 868. The United States argues that the delivery of Scott's Memorial and civilian clinic records triggered the accrual clock here, like in *Wallace*, regarding the involvement of the Air Force military clinic.

The Seventh Circuit has declined to announce a rigid rule setting the date of accrual to coincide with the retention of counsel, receipt of medical records, or any other specific event. *See Blanche*, 811 F.3d at 960-61 (citing *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 142 (2d Cir. 2011)). Instead, the Court of Appeals instructs that the accrual date should align with the time when a plaintiff had reason to suspect that the injury suffered related in some way to the medical treatment received. The United States overlooks a key difference in its explanation of *Wallace*. In *Wallace*, the plaintiff actually received prenatal medical care at the federally qualified clinic, and the pertinent medical records solidly indicated an issue with that clinic's treatment. Here, Scott received no medical care or treatment from the military clinic, had no relationship to that clinic, and had no reason to suspect a wholly unrelated clinic as the cause for his inadequate medical treatment or injuries. This is also the glaring difference between the present case and the circumstances reviewed by the Seventh Circuit in other cases. *See also P.W. by Woodson v. United States*, 990 F.3d 515, 519-22 (7th Cir. 2021) (accrual clock began shortly after birth where treating physician explained risks of attempting natural delivery of an unusually large child during prenatal care, yet opted for natural delivery anyway causing traumatic birth and injury to the child); *Blanche,* 811 F.3d at 960-61 (accrual clock triggered shortly after birth against prenatal care providers where baby

was diagnosed with Erb's Palsy before leaving the hospital due to attempted vaginal delivery instead of a C-section); *Arteaga v. United States*, 711 F.3d 828, 831 (7th Cir. 2013) (for mother who had birth complications after vaginal delivery of an 11-pound child the accrual clock began against prenatal care providers after she met with an attorney and obtained her medical records). In all of these cases, the government-affiliated medical providers actually provided treatment and interacted with each respective plaintiff at some point leading to the ultimate injury. Here, Scott had no interaction with the military clinic, and even as he suspected something had gone awry in his medical treatment or upon receiving his medical records, he had no reason to suspect the military clinic as a potential cause of his injury.

There is no dispute that Scott timely pursued his claims against both entities known to be involved in his medical treatment or the transmittal of his medical records, Memorial and the civilian clinic. After he received information pointing to involvement on behalf of the military clinic, he acted to initiate a claim against the Air Force, through an administrative claim and then through a lawsuit. The Court finds that Scott's claims are timely as the FTCA accrual clock was triggered in September 2018 when, through discovery, Scott finally had reason to connect the military clinic to his injuries. As such, the United States' motion for summary judgment (Doc. 185) is denied.

### III.    United States' Motion on behalf of the Air Force and HHS (Doc. 186)

In its other motion for summary judgment, the United States argues that Scott fails to establish the actions (or alleged omissions) by either the civilian or military clinics were the proximate cause of his injuries. Essentially, the United States asserts that any alleged negligence by either clinic was not a material and substantial element in provoking Scott's injury where Scott failed to update his contact information and to follow instructions to visit

his primary care provider. Even if the civilian clinic received the records from Memorial and attempted to contact Scott, according to the United States, this attempt would have been futile as Scott changed addresses without informing the clinic. Moreover, Scott received instructions to follow up with his primary care provider, but he failed to heed this directive. As such, the United States contends that receipt of the medical records faxed by Memorial would not have impacted Scott's treatment at the civilian clinic. Additionally, the United States contends that deficient medical treatment by other providers was not a foreseeable consequence of non-receipt of faxed medical records.

Scott maintains that the civilian clinic possessed valid contact information during the relevant time period underlying this action. He used his aunt's address, and even after he personally moved, he continued to use his aunt's phone and address as a valid contact method. There is also no definitive evidence, according to Scott, that he received a discharge instruction from Memorial to contact and visit Dr. Elleby. And because all facts and inferences are construed in the nonmovant's favor on summary judgment, Scott argues that he is entitled to a favorable inference that he did not receive such an instruction. Scott also argues that negligence by the military and civilian clinics was a material and substantial factor in the development of his injury because Dr. Elleby was unable to perform the indicated follow-up causing a lapse in his care. Combating the United States' foreseeability argument, Scott avers that the lapse in continuity of his care was an entirely foreseeable consequence of perpetual use of an unreliable communication system regarding patient records. Scott claims he would have avoided the ultimate amputation if Dr. Elleby affirmatively followed up with him, but instead he was subjected to a carousel of other doctors whose care led to amputation. Under Illinois law, according to Scott, negligence on

behalf of subsequent treatment providers does not necessarily absolve another defendant of liability.

As an initial matter, both parties accept Illinois substantive law as controlling regarding negligence in this diversity case. To recover damages for negligence in Illinois, a plaintiff must prove the existence of a duty, a breach of that duty, and that the negligent conduct proximately caused the alleged injury. *Avalos v. Pulte Home Corp.*, 474 F. Supp. 2d 961, 968 (N.D. Ill. 2007). Under Illinois law, proximate cause encompasses both cause-in-fact and legal cause. *Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012). For cause-in-fact, a plaintiff must demonstrate that the defendant's conduct was a material element and a substantial factor in bringing about the injury. *Id.* (citing *Lee v. Chicago Transit Authority*, 605 N.E.2d 493, 502 (Ill. 1992)). Legal cause is essentially a foreseeability inquiry that requires a court to determine whether the injury is of a type that a reasonable person would anticipate as a likely result of his or her conduct. *Id.* Proximate cause cannot be established where the causal connection is contingent, speculative, or merely possible. *Walker v. Macy's Merchandising Group, Inc.*, 288 F. Supp 3d 840, 856 (N.D. Ill. 2017). Typically, proximate cause issues are fact-intensive and specific, and, thus, uniquely for the fact finder's determination. *Hemminger v. LeMay*, 11 N.E.3d 825, 830 (Ill. App. Ct. 2014). Summary judgment may be appropriate on the issue of proximate cause, however, when the facts fail to demonstrate both cause-in-fact and legal cause, are undisputed, and are such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them. *Blood*, 668 F.3d at 546; *Avalos*, 474 F. Supp. 2d at 968.

If an intervening act by a third party enters the causal chain, Illinois courts apply a test to determine whether the first negligent party could have reasonably anticipated that

intervening cause as a natural and probable result of the first party's own negligence. *Avalos*, 474 F. Supp. 2d at 968-69. Essentially, the issue is framed as whether the acts of the defendant are a cause of the plaintiff's injury, or whether the defendant's acts create a condition by which the injury is made possible by the independent actions of another party. *Id.* Such a furnished condition does not constitute legal cause. *Id.*

The Court finds that a factual question exists as to whether Scott was reachable from his listed contact information with the civilian clinic, namely his aunt's address and phone number. The United States argues that Scott was unreachable, and so, receipt of the records from Memorial would have resulted in no difference in outcome. Scott claims that he used his aunt's contact information even after he moved to his own apartment. Based on this issue of fact, the Court cannot conclude as a matter of law that the civilian clinic's receipt of Scott's records would be inconsequential because he was unreachable.

Moreover, a genuine issue of fact exists as to whether Scott would have presented to the clinic had Dr. Elleby affirmatively reached out or whether he ignored a directive to follow up with the clinic himself. The record indicates that Scott sought medical help at other institutions due to the severity of his symptoms, and drawing a reasonable inference in his favor as the Court must at this time, it is reasonable to infer that he would have presented to receive treatment or evaluation from his primary care physician if the clinic affirmatively reached out to him. And, according to Scott's discharge documents from Memorial Hospital in March 2015, the "Activity Restrictions or Additional Instructions" section contained an instruction to "[r]eturn to Memorial tomorrow for a venous Doppler of the right lower leg and ankle brachial index." (Doc. 166-1, p. 217). It appears that Scott returned for that Doppler study. (*Id.* at p. 135). The discharge notes also stated, "Follow-up with primary care physician

within 2-3 days." (*Id.* at p. 217). The subsequent section was titled "Follow-up" and explained that "SCOTT, CRAIG D has been referred to the following clinics/specialists for follow-up care: Elleby, Erynn Elizabeth, MD," detailing the "Follow-Up Plan" as "See in 3 days – make appt." (*Id.*). Later in the discharge notes, generic, boilerplate language appears urging the reader to "[f]ollow up with [their] healthcare provider as directed." (*Id.* at p. 219). These discharge notes are not clear as to whether Scott held the responsibility to reach out to Dr. Elleby. The term "follow-up" appears outside of the "additional instructions" section three times: as the title of a section, to identify the referred follow-up care provider, and to identify the follow-up plan. (*Id.* at p. 217). As semantically fastidious as it may seem, in each of these instances "follow-up" appears as a noun or adjective, not in the phrasal verb form (i.e., follow up). The "additional instructions" section also contains the phrase with the hyphen, in its adjective or noun form: Follow-up with primary care physician within 2-3 days. It is a reasonable inference at this stage that the discharge paperwork noted that a *follow-up* appointment would occur in 2-3 days, not that Scott personally needed to *follow up* with his primary care physician in that time and then proceeded to ignore that instruction. This inference is supported by subsequent language in the discharge documents with the boilerplate instruction stating, "Follow up with your healthcare provider as directed: You may need more tests to find the cause of your leg pain." (*Id.* at p. 219). Overall, as to the cause-in-fact needed to establish proximate cause, the Court finds a genuine issue of material fact when viewing the evidence in a light most favorable to Scott.

Turning to legal cause (foreseeability), the United States asserts that Scott accessed care despite the purported mishandling of records by the civilian and military clinics, and he received treatment from other providers during the time Scott's retained expert believes his

leg was salvageable. (Doc. 166-4, p. 82). Because those providers failed to order vascular testing or involve a vascular specialist, their medical services constituted unforeseeable, intervening causes of Scott's ultimate amputation. Alternatively, Scott argues that patient injury is certainly a natural and probable result of a communication breakdown between medical providers. The Court finds that failure to properly handle Scott's records and appropriately follow up with Scott given his emergency department visits at Memorial could foreseeably force a patient to seek other treatment, possibly less informed treatment than would occur with a primary care physician who has a history with a patient. Furthermore, a factual question exists as to whether Scott would have received different and effective treatment had the civilian clinic and Dr. Elleby obtained and properly handled the relevant medical records from Memorial avoiding the result of amputation. There is competent evidence (including Dr. Elleby's testimony regarding the course of treatment had she received the records) that, absent the purported mishandling of the records by the military and civilian clinics causing a disruption to the continuity of his care, Scott would not have been forced to independently seek treatment from a variety of other providers over the following weeks and could have been spared from undergoing amputation. Moreover, Scott has retained an expert who opines his leg was salvageable into June 2015, whereas the United States' expert estimates that this was not the case as Scott's leg could not have been salvaged even by early April 2015. This creates a genuine issue of material fact as to whether the fax system failure delayed Scott's treatment and impacted the ultimate salvageability of his leg. Notably, the causal chain here may very well be tenuous and remote rather that proximate, but at this stage the Court must not engage in weighing the credibility of the parties' expert testimony and other evidence.

The United States is not entitled to summary judgment on the issue of causation because there are genuine issues of material fact that preclude judgment as a matter of law. The second motion for summary judgment filed by the United States (Doc. 186) is denied.

## IV.    Scott's Motion (Doc. 188)

Scott moves for summary judgment only as to the United States' affirmative defenses of comparative fault and failure to mitigate damages. Scott primarily argues that the United States' negligence, along with the treatment from other doctors, constitutes an intervening cause that breaks the chain of causation between Scott's actions and his injury. He also asserts that his conduct in habitually smoking and discontinuing use of his anticoagulant prior to seeking treatment merely created a condition necessitating treatment. The relevant inquiry, according to Scott, is whether he should have anticipated Defendants' conduct as a natural and probable result of his own conduct. On the contrary, the United States contends that Scott contributed to his injury, as well as its rapid progression, by continually smoking against his doctors' recommendations and failing to get necessary lab work done to remain on his anticoagulant.

In assessing comparative negligence under Illinois law, an objective test employing a reasonable-person standard is applied that asks whether a plaintiff used the degree of care which an ordinarily careful person would have used under similar circumstances. *Clanton v. United States*, 943 F.3d 319, 323 (7th Cir. 2019). In Illinois, comparative negligence applies when a plaintiff's negligence is a legally contributing cause of his injury only if such negligence is a substantial factor in bringing about his injury, and there is no rule restricting his respective responsibility. *Ford-Sholebo v. United States*, 980 F. Supp. 2d 917, 997 (N.D. Ill. 2013). Usually, comparative negligence is a question of fact for the fact finder, but it can be

resolved as a matter of law when "all reasonable minds would agree that the evidence and reasonable inferences therefrom, viewed in light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *West v. Kirkham,* 566 N.E.2d 523, 525 (Ill. App. Ct. 1991).

In his motion for summary judgment as to the comparative negligence affirmative defense, Scott's argument largely collapses into factual disputes. He argues that his habitual smoking and discontinued use of his anticoagulant merely created the condition requiring treatment, not the cause of his injury. Scott also attempts to separate his case from *Krklus v. Stanley,* 833 N.E. 2d 952 (Ill. App. Ct. 2005). In *Krklus,* the defendants introduced evidence that the decedent was negligent in failing to follow his medical provider's advice to regularly take blood pressure medication, and the decedent misinformed his provider about his compliance with taking such medication. *Id.* at 961-62. Scott distinguishes the present facts because he informed medical providers on three occasions that he no longer took anticoagulants, and he diligently sought treatment with an honest disposition regarding his health.

Here, like *Krklus*, Scott's underlying condition of a peripheral vascular disease and hypercoagulation disorder brought about a need for treatment. (Doc. 166-7, pp. 75-76). His failure to continue taking an anticoagulant or report to the civilian clinic to get lab work done and resume taking the medication could have exacerbated his condition and led to his ultimate amputation. The record indicates that Dr. Paul Collier, Scott's retained vascular specialist, testified that Scott's condition required intervention by a vascular specialist and that thrombolytic (or lytic) therapy could have salvaged Scott's leg through approximately the first week of June 2015. (Doc. 166-4, pp. 50, 105-106). Collier stated that if Scott stayed on

his anticoagulant medication (Coumadin), he would not have required an amputation. (*Id.* at pp. 71-72). A vascular surgeon expert submitted by the United States, Dr. James Black, opined that lytic therapy is most effective for clots present for less than two weeks, so such therapy would not likely have been effective through early June 2015 as suggested by Collier. (Doc. 190-3, p. 3). Instead, Black suggests that since Scott arrived at the VA on March 2, 2015, complaining of calf, ankle, and toe pain for weeks, lytic therapy would not likely achieve limb salvage even at the time Scott presented for a Doppler study at Memorial on April 4, 2015. (*Id.*). While Scott underwent treatment at Barnes Hospital in June 2015, one test showed normal circulation to his ankle but not toward his foot and toes. (*Id.*). Dr. Black assessed this result as consistent with a distal clot indicative of a rapidly progressive loss of vessels, which could be contributed to by Buerger's disease or an underlying hypercoagulation disorder that caused thrombosis of the small vessels of the foot. (*Id.* at pp. 3-4). For either of these conditions, smoking cessation would be the primary solution to avoid disease progression, and for the latter, compliance with a Warfarin regimen (an anticoagulant) would also help. (*Id.* at p. 4). Especially considering the expert testimony, that Scott's leg was not likely salvageable even in early April 2015, there is a strong connection between Scott's purportedly negligent conduct and his resulting injury, and as such, comparative negligence is an appropriate affirmative defense. Moreover, these factual disputes cannot be resolved on summary judgment.

In light of the United States' assertion that Scott also disregarded instructions to contact his primary care provider after his March 31 appointment, Scott argues that the United States' retained experts confirm nothing could have changed or prevented his injuries even if he had followed up. In making this argument, Scott ignores the expert testimony he

advances himself. His experts claim his leg was salvageable for much longer, and perhaps, based on that assessment, follow-up may have made a difference. There is also a dispute, as described above, as to whether Scott actually received an instruction to follow up and whether he disregarded that instruction. All of these issues preclude summary judgment. Scott may be responsible to some extent for his injuries, and in assessing damages, this may also come into play.

As a note, general health advice, such as generic directives to lose weight, stop smoking, or to exercise, are typically not appropriate considerations in assessing comparative fault. *See Krklus*, 833 N.E.2d at 964. But a factual issue exists as to whether Scott received general advice to quit smoking, as he testified, or if the repeated directives of his medical providers to quit smoking specifically related to his underlying conditions and exceeded the typically generic nature of such advice. (Docs. 166-1, pp. 28-29; 166-4, pp. 57-58; 166-7, pp. 74-76).

Additionally, Scott argues that the United States has failed to produce any evidence whatsoever as to the specific conduct Scott committed to cause an aggravation to his injuries or damages, therefore an affirmative defense for failure to mitigate damages is inappropriate. In opposition, the United States contends that, based on his medical records, Scott missed physical therapy appointments, failed to comply with direction by his prosthetist including missing appointments, and failed to meaningfully participate in his exercise plan. (Docs. 200-1; 200-2; 200-3; 200-4; 200-5).

"Mitigation of damages imposes a duty on an injured party to exercise reasonable diligence and ordinary care in attempting to minimize his damages after injury has been inflicted." *See Malanowski v. Jabamoni*, 772 N.E.2d 967, 973 (Ill. App. Ct. 2002) (internal

quotations omitted). Failure to mitigate is not a defense to liability, but rather concerns the amount of recoverable damages. *Ner Tamid Congregation of North Town v. Krivoruchko*, 638 F. Supp. 2d 913, 920 (N.D. Ill. 2009). For example, when a patient fails to participate in prescribed physical therapy post injury, a mitigation of damages defense may be appropriate. *Malanowski*, 772 N.E.2d at 973.

In this action, Scott alleges damages for past and future physical pain and suffering, mental anguish, emotional distress, and disability and/or loss of normal life. (Doc. 179, ¶ 43; *see also* member case, *Scott v. USA*, No. 19-cv-1029-NJR, at Doc. 37, ¶ 34). To the extent that Scott argues liability on behalf of the United States for the length or inadequacy of his recovery, his continued mental or emotional distress given the outcome of his recovery, or any other damage related to the recovery process, this is an appropriate affirmative defense.

Accordingly, the Court finds that Scott is not entitled to summary judgment regarding the affirmative defenses of comparative negligence and mitigation of damages raised by the United States. Scott's motion for summary judgment (Doc. 188) is denied.

## MOTIONS REGARDING EXPERT TESTIMONY AND OPINIONS

### I.    Legal Standard

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); *see also Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor*

*Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

> Federal Rule of Evidence 702 provides that expert testimony is admissible if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under this rule, an expert witness may testify about a scientific issue in contention if the testimony is based on sufficient data and is the product of a reliable methodology correctly applied to the facts of the case. *Lyons v. United States*, 550 F. Supp. 3d. 588, 591 (S.D. Ind. 2021) (citing *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)). As such, a three-step analysis emerges as to admitting expert testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The Court must determine whether: (1) the witness is qualified; (2) the expert's methodology is scientifically reliable; and (3) the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Id.*

The district court is the gatekeeper with respect to the screening of expert testimony in ensuring it is both relevant and sufficiently reliable. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). The "key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion: the inquiry must 'focus . . . solely on principles and methodology, not on the conclusions they generate.'" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)

(citing *Daubert*, 509 U.S. at 595). "So long as the principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*. (quoting *Daubert*, 509 U.S. at 596).

Finally, an expert must explain the methodologies and principles that support his or her opinion; he or she cannot simply assert a "bottom line" or *ipse dixit* conclusion. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). The district court possesses "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007)). The "critical inquiry is whether there is a *connection* between the data employed and the opinion offered." *Gopalratnam*, 877 F.3d at 781.

## II.     United States' Motion to Exclude Opinions of Scott's Expert Dr. Paul Collier and to Bar Opinions from Scott's Expert Timothy Hawkins (Doc. 187)

Scott disclosed two experts with which the United States takes issue: Timothy Hawkins and Paul Collier, M.D. Timothy Hawkins is a healthcare and hospital administration expert who intends to testify about the conduct of the civilian and military clinic from an administrative perspective and the standard of care for a reasonable medical provider in similar circumstances. (Doc. 166-8). Hawkins is board certified in hospital

administration and as a hospital safety manager. (*Id.*; Doc. 193-1). He retired from his last hospital administration position, as chief operating officer of Villages Regional Hospital and executive vice president and chief operating officer of the Central Florida Health Alliance, in late 2012. (Docs. 186-1, p. 7; 193-1). Throughout his career, Hawkins worked in a variety of administrative leadership roles in physician practices, clinics, cancer centers, and hospitals. (Docs. 186-1, pp. 8-11; 193-1).

The United States moves to exclude the opinions provided by Hawkins, arguing his opinions fail to meet the standard for admissibility required by Federal Rule of Evidence 702 and *Daubert*, because they lack reliability, and Hawkins lacks the relevant experience and qualifications to provide such opinions. Primarily, the United States asserts that Hawkins has no work experience in a family practice setting, especially one where residents provide medical care, or in the medical community in the relevant locality of Belleville, Illinois, therefore he lacks experience to provide opinions about how such a clinic should handle distribution of contact information for its providers. Moreover, the United States contends that Hawkins lacks relevant experience to opine about the military clinic's handling of faxes and its fax machine usage. Specifically, the United States criticizes an opinion in Hawkins's report regarding the military clinic's duty to notify a sender of mistakenly received medical records, as he later testified that HIPAA contains no such requirement. Lastly, the United States avers that Hawkins is not qualified to offer technical opinions regarding the receipt of faxes at the military clinic and whether the fax software misdialed or failed to connect.

In response, Scott first argues that family practice centers with resident providers do not possess unique characteristics that would disqualify Hawkins's opinions in this matter and that Illinois does not employ a stringent locality standard and accepts certain uniform

standards applicable regardless of locality. Scott also argues that Hawkins's opinions align with other witnesses including the military clinic's IT contractor, Jamie Cymbola, the Chief Technology Officer of Forward Advantage, Randy Hunsaker, and other military clinic employees. Scott concedes that Hawkins's opinion regarding the likelihood that the military clinic received the faxes and the likelihood that the automated fax system misdialed a different fax number do not qualify as expert opinions requiring technical expertise or some quantifiable value, rather, in reaching these conclusions Hawkins relied on common knowledge and experience.

Upon reviewing the evidence, the Court disagrees with the United States that Hawkins is unqualified to testify about the standard of care in this case as his experience is limited to the hospital setting and falls outside of the Belleville, Illinois locality. The United States does not offer any practical reasons why the family practice clinical setting with resident providers operates in a fundamentally different way than a general hospital or health care setting. Nor does it explain what specific knowledge or experience an expert would need in order to evaluate such a setting. The United States also fails to offer similar insights as to the Belleville area. Hawkins has decades of experience in the field of health care administration in a variety of settings from hospitals to cancer centers. Generally, a person testifying as an expert must be qualified by knowledge, skill, experience, training, or education and must testify to something more than what would be obvious to a layperson. Fed. R. Civ. P. 702; *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998). "An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp.*, 619 F.3d at 761. Generally, Hawkins

opines on the standard of care based on his experience in health care administration, and these opinions may assist the trier of fact in analyzing the standard of care imposed on health care administrators in this case. The United States can certainly challenge such opinions on cross-examination or with its own evidence to the contrary.

The Court finds, however, that Hawkins's opinions relating to the likelihood of receipt of faxes or the likelihood of a fax system misdialing a number must be excluded because he is not qualified as an expert, through experience or training, with such technology to form these opinions. Moreover, Hawkins simply used common knowledge to reach his conclusion and offered an educated guess admittedly deferring to technical experts. (*See* Doc. 186-1, p. 20). This testimony will not assist the trier of fact in understanding the evidence or determining a fact in issue as other witnesses will discuss this topic based on personal experience and technical qualifications. The United States' motion to exclude (Doc. 187) is granted in part as to these technical fax receipt and operation opinions offered by Hawkins, but is otherwise denied as to Hawkins.

Moving to Dr. Paul Collier, the United States seeks to exclude his opinion regarding alternatives to Coumadin as it was not included in his report but rather arose during re-direct examination during deposition. Because this opinion surfaced only during his deposition, the United States argues that Dr. Collier did not evaluate whether these alternatives were safe or indicated for Scott, who specifically should have considered Coumadin alternatives, or if those alternatives would be efficacious for someone like Scott with hypercoagulation and peripheral vascular disease. As such, the United States argues these opinions are of limited value to the trier of fact and should be excluded.

Alternatively, Scott states that he does not intend to offer any opinions as to whether

he should have received a prescription for a Coumadin alternative. But he argues that the challenged testimony is appropriate as an expert witness may include information given during the expert's deposition pursuant to Federal Rule of Civil Procedure 26(e)(2).

The Court finds that as a vascular specialist Dr. Collier is qualified to testify that alternatives to Coumadin exist. But because in reviewing the medical records and circumstances underlying this case, Dr. Collier did not assess whether Scott was specifically eligible to receive a Coumadin alternative, he cannot opine on whether these options were appropriate alternatives available to Scott's treating physicians at the time. In any event, it does not appear that Scott plans to make such an argument. The United States' motion to exclude the opinions of Dr. Collier relating to Coumadin alternatives (Doc. 187) is granted in part to the extent that he testifies about Scott's specific eligibility to receive such alternatives.

### III.   Scott's Motion to Bar Opinions of United States' Expert Witnesses (Doc. 190)

Scott does not attack the entirety of the opinions offered by the United States' medical experts but challenges the methodology and reliability of certain opinions expressed by these experts. First, Scott challenges causation opinions offered by family practice physician Dr. Janet Albers and argues that Dr. Albers does not have the relevant experience or expertise to support opinions regarding vascular or endovascular interventions. In her report, Dr. Albers opines:

> "It is highly unlikely that the 10 weeks between March 31 and June 14, 2015 — including, if referral to a vascular surgeon during that period by Dr. Elleby or anyone else—would have changed the options for treatment. The pathology from the amputation revealed chronic thrombosis with mild atherosclerosis. The options would have been medical management, i.e., Coumadin therapy, and smoking cessation which the Belleville Family Health Center providers attempted to provide or counsel on, but Mr. Scott chose not to pursue. Stopping Coumadin without consulting a medical professional and despite letters and phone calls attempting to have Mr. Scott present for his bloodwork

made it more likely that he would thrombose and lose his limb. No vascular procedure or intervention could have remedied this."

(Doc. 190-1). The United States asserts that these causation opinions are appropriate and admissible because she applied her relevant training, education, and experience in reviewing the medical and discovery materials to form reliable opinions.

Dr. Albers is a board certified family medicine practitioner and a professor and department chair of Family and Community Medicine at Southern Illinois University School of Medicine. (*Id.*). In these roles, she oversees all educational, clinical, and research aspects of her department and actively participates in daily department activities, including medical records handling issues, to ensure continuity of care for patients. (*Id.*). Throughout her 30-year career, Dr. Albers has experience treating patients with peripheral vascular disease and hypercoagulability disorders. (*Id.*).

While a medical degree does not qualify a doctor to opine on all medical subjects, a physician does not need to be a specialist in a given field to provide an expert opinion where she has the knowledge, training, and education to reach her conclusions. *Gayton*, 593 F.3d at 617 (7th Cir. 2010). Dr. Albers is a board certified family medicine practitioner. Undoubtedly, she responds to a variety of medical issues outside of vascular specialties. But her report indicates that she has extensive medical knowledge and training paired with specific experience treating patients with peripheral vascular disease and hypercoagulability disorders throughout her career. Dr. Albers reviewed Scott's medical records along with other discovery in this case. It appears that she applied her many years of experience and education in the medical field, as well as her specific experience treating conditions like Scott's, to reach her conclusions and assess injury and its cause. This is widely accepted as a sound and reliable methodology. *See Walker v.*

*Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (finding expert's testimony admissible when he applied his experience to the medical records). Scott's motion to exclude (Doc. 190) is denied as to the causation opinions of Dr. Albers.

Scott also challenges causation opinions offered by vascular surgeon Dr. James Black as lacking a reasonable degree of medical certainty. Along with these opinions, Scott also attacks life expectancy opinions by Dr. Black, arguing that Dr. Black does not reference his methodology or any research as a basis for his opinion. The United States argues that Scott misunderstands Dr. Black's report contending that arterial thrombosis (distal clot) was the final pathway for Scott's amputation. Many factors contributed to the development of this distal clot, including smoking, Buerger's Disease, and Scott's decision to quit his Coumadin regimen, making it more likely for the disorder to develop and progress, leading to amputation.

As with Dr. Albers, the Court finds Dr. Black's causation opinions are based on a sufficiently reliable methodology (namely applying his extensive medical experience with vascular surgery to the medical records and discovery in this case), and his opinions will assist the trier of fact in analyzing the relevant issues. Dr. Black formed his opinions through review of Scott's relevant medical records, clinical records, imaging, and deposition testimony and applied his medical knowledge and experience to those records. His conclusions are obviously connected to the data available and his relevant experience. *See Hall v. Flannery*, 840 F.3d 922, 928 (7th Cir. 2016) (expert's opinions were based on sufficiently reliable methodology when he based his conclusions on medical records, CT scans, medical notes, and deposition testimony).

Moreover, simply because Dr. Black explains many contributing factors to the distal clot that led to Scott's amputation, his opinions do not fail for lack of medical certainty. He used the available medical records and information guided by his experience and professional knowledge to develop these opinions, and his identification of more than one contributing factor does not render such an opinion medically uncertain. As to the life expectancy opinion, the same analysis applies. It is clear that Dr. Black formed an educated opinion about Scott's life expectancy based on his experience treating patients with vascular conditions, Scott's medical records, and research (Doc. 190-3, pp. 6-68) published in the Journal of Vascular Surgery. This is sound methodology in determining life expectancy and will likely help the trier of fact in assessing potential damages.

Accordingly, Scott's motion to bar expert testimony (Doc. 190) is denied as to Dr. Black as well.

### IV.   United States' Motion to Strike Report and Testimony of Scott's Expert, Dr. Paramjit Chopra (Doc. 166)

The remaining motion regarding expert testimony is concerned both with the content of the proposed expert's report and the timing of its disclosure. The United States primarily argues that Scott's expert report from Dr. Paramjit Chopra was untimely. In the alternative, the United States argues that the report is insufficient and confusing.

Pursuant to Rule 26(a)(2), a party must disclose by the court-ordered deadline a written report of a retained expert that includes "a complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i) & (D). Rule 26(a)(2) further requires that parties disclose rebuttal reports—that is, "evidence [that]

is intended solely to contradict or rebut evidence on the same subject matter identified by another"—by the court-ordered deadline or, or if no such time is set, 30 days after the other expert's disclosure. FED. R. CIV. P. 26(a)(2)(D)(ii). Rule 26 also permits an expert to supplement his or her disclosure if the expert "learns that in some material respect the disclosure . . . is incomplete or incorrect." FED. R. CIV. P. 26(e)(1)(A), (2); *Callpod, Inc. v. GN Netcom, Inc.*, 703 F. Supp. 2d 815, 823 (N.D. Ill. 2010) ("Supplemental expert reports are permitted if they are based upon information discovered after the initial disclosure or upon the realization that the original disclosure was incorrect or incomplete.").

If a party files untimely reports, a district court may exclude the party's expert from testifying at trial on the matters the party was required to disclose. *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785–86 (7th Cir. 2000) (citing FED. R. CIV. P. 37(c)(1)). "The sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'" *Id.* (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)). As to the latter, courts consider: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Karum Holdings LLC v. Lowe's Cos., Inc.*, No. 15 C 380, 2017 WL 5593318, at *3 (N.D. Ill. Nov. 21, 2017) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *King v. Ford Motor Co.*, 872 F.3d 833, 838 (7th Cir. 2017).

Here, Scott disclosed his experts on August 25, 2021. Pursuant to the operative scheduling order, the United States' expert disclosures were due on January 18, 2022, and

depositions of such experts were due on February 28, 2022. (Docs. 164; 165). Moreover, third-party defendant experts were to be disclosed by April 15, 2022, with depositions of those experts due May 6, 2022. (*Id.*). On April 15, 2022, Scott produced an expert report from Paramjit Chopra, M.D. (Doc. 166-12). In this report, Dr. Chopra opines that Scott did not suffer from Buerger's Disease. (*Id.*). As such, the United States characterizes this report as rebuttal to Dr. Black's opinions to the contrary. But Scott classifies the disclosure as a supplemental disclosure naming Dr. Chopra as a rebuttal witness. Scott claims that his disclosure was timely and justified by his October 2021 communications with opposing counsel. He references emails exchanged between his counsel and counsel for former defendant Memorial Hospital that included the United States. (Docs. 170-4; 170-5). In these emails, Memorial sought to disclose its third-party experts by April 15, 2022, and produce such experts by May 15, 2022. Counsel for Scott replied stating, "To the extent I need to do any rebuttal experts or opinions, I could likely operate on that same schedule." (Doc. 170-4). Due to this email exchange, which received no pushback from the United States, Scott operated under the assumption his rebuttal deadline was pushed to April 15 by agreement of the parties. On the other hand, the United States argues that while it acknowledged the parties had at least some dates in mind to use as markers, the parties would circle back to discuss what might need to be filed with the Court to update the schedule. On December 14, 2021, the United States sent a proposed joint amended scheduling order via email to Scott. (Doc. 171-1). The proposed amended scheduling order remained silent on rebuttal expert disclosures, and the United States provided no objection. (*Id.*; Docs. 171-2; 171-3).

The Court finds that Scott's disclosure of the rebuttal[2] report by Dr. Chopra was untimely. Clearly, Scott did not comply with any court-ordered deadline, as there was none, and did not file his disclosure within 30 days after the other expert's disclosure, as required by Rule 26. From the communications between the parties, there is no indication that the parties agreed upon April 15 for rebuttal disclosures other than Scott's counsel mentioning in passing that he could likely operate on the same schedule as that for third-party expert disclosures. Because the disclosure was untimely, the Court will decide whether Scott's untimeliness was justified or harmless.

As an initial matter, there is no indication that the disclosure occurred in bad faith. Miscommunication along with lack of clarification appear to be central to Scott's untimely disclosure, rather than bad faith. Moreover, the United States cannot credibly argue prejudice or surprise when Scott's counsel made known the possibility of rebuttal witnesses. Furthermore, the disclosure was made prior to the close of discovery, and the testimony is unlikely to disrupt trial. Thus, the Court declines to bar Dr. Chopra's testimony based on untimeliness.

As to the content of Dr. Chopra's report, the United States argues the opinions are not proper rebuttal opinions as they inject new theories into the case and stretch beyond topics discussed by defense experts. The United States also asserts the opinions are confusing and lack specificity. Scott argues that Dr. Chopra's report appropriately provides rebuttal to the possibility of the Buerger's disease diagnosis raised by a defense expert and the comparative fault defense that the United States also supports through its expert testimony.

---

[2] The Court recognizes this report as rebuttal, not a supplemental disclosure, as Rule 26 permits supplement disclosures based on a prior disclosure, and here, Dr. Chopra was not previously disclosed.

The Court agrees with Scott. Dr. Chopra's report appears to be limited to refuting topics raised by the defense experts. Moreover, as with the other experts discussed above, Dr. Chopra is appropriately qualified as a board certified interventional radiologist with an active practice providing diagnostic and therapeutic management to patients like Scott, and appears to base his opinions on his experience and knowledge in treating patients with vascular conditions. The United States can address this testimony through vigorous cross-examination and through contradictory evidence provided by its own previously disclosed experts. Accordingly, the United States' motion to strike Dr. Chopra's report (Doc. 166) is denied.

## CONCLUSION

For these reasons, all three motions for summary judgment (Docs. 185; 186; 188) are **DENIED**. The United States' Motion to Strike the report and testimony of Dr. Chopra (Doc. 166) is **DENIED.** The Motion to Exclude certain opinions of Dr. Paul Collier and Bar Mr. Timothy Hawkins filed by the United States (Doc. 187) is **GRANTED in part** and **DENIED in part**. Dr. Collier is barred from testifying that any Coumadin alternative was available in treating Scott specifically. Mr. Hawkins is barred from testifying as to the fax receipt and technical operation (or malfunction) of automatic fax systems. Lastly, Scott's Motion to Bar Opinions of the United States' Expert Witnesses (Doc. 190) is **DENIED**.

**IT IS SO ORDERED.**

DATED:   April 12, 2023

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

Page 32 of 32